UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| CHARLES W. HANOR, et al., | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | )  Case No. 1:21-CV-34-ACL |
| | ) |
| DICKY G. HANOR, et al., | ) |
| | ) |
|     Defendants. | ) |

## **MEMORANDUM AND ORDER**

Presently pending in this consolidated action is Defendant Dicky Hanor's Motion to Exclude Jake LaRue from Testifying.  (Doc. 88.)  This matter is fully briefed and ripe for disposition.

**A.  Standard**

The admission of expert testimony in federal court is governed by Federal Rule of Evidence 702.  *Wagner v. Hesston Corp.*, 450 F.3d 756, 758 (8th Cir. 2006).  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The rule was amended in 2000 in response to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), which charged trial judges with a "gatekeeping" role to exclude unhelpful and unreliable expert testimony.  The proponent of the expert testimony

1

has the burden to prove its admissibility by a preponderance of the evidence. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). The admissibility of such evidence is committed to the district court's "broad discretion." *Wagner v. Hesston Corp.*, 450 F.3d 756, 758 (8th Cir. 2006).

      Rule 702's mandate is a flexible one. The Eighth Circuit has stressed that Rule 702 has a "liberal thrust" favoring admission of expert testimony. *Johnson v. Mead Johnson & Co.*, 754 F.3d 557, 562 (8th Cir. 2014). The "screening requirement" of Rule 702 has been reduced to a three-part test: (1) the testimony must be useful to the fact-finder in deciding a factual issue, *i.e.*, it must be relevant; (2) the expert must be qualified to assist the fact-finder; and (3) the testimony must be reliable or trustworthy in an evidentiary sense. *In re Bair Hugger Forced Air Warming Devices Products Liab. Litig.*, 9 F.4th 768, 777 (8th Cir. 2021). A court may also consider the nonexclusive factors outlined in *Daubert* for determining admissibility of expert testimony under Rule 702, but such consideration is not required in every case. *Russell v. Whirlpool Corp.*, 702 F.3d 450, 456 (8th Cir. 2012) (noting the court should "use, adapt, or reject *Daubert* factors as the particular case demands") (quotation omitted).

      First, courts must consider whether an expert's testimony relates to any of the issues in the case when considering the usefulness and relevance factor. *Daubert*, 509 U.S. at 591. Next, in determining whether a witness is sufficiently qualified, Rule 702 instructs courts to consider the witnesses' knowledge, skill, experience, training, or education. Fed. R. Evid. 702; *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1014 (8th Cir. 2012). "[A]n expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999); *see also Moe v.*

*Grinnell College*, 547 F.Supp. 3d 841, 846 (S.D. Iowa 2021) ("The test is whether the expert's education and experience demonstrate a knowledge of the subject matter.").

Finally, in assessing the reliability of an expert's testimony, courts should "make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006). Courts properly exclude expert testimony where it is "speculative, unsupported by sufficient evidence, or contrary to the facts of the case." *Id*. "Trained experts commonly extrapolate from existing data. But nothing in *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* [1] of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). When the analytical gap between the data and proffered opinion is too great, the opinion must be excluded. *Id*. (Citation omitted.)

The factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility. *First Union Nat'l Bank v. Benham*, 423 F.3d 855, 862 (8th Cir. 2005). Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. *Bair Hugger*, 9 F.4th at 778 (citing *Daubert*, 509 U.S. at 596).

"When a witness provides non-scientific, generalized testimony, based upon expert specialized knowledge, a different reliability analysis is appropriate." *State v. Minor*, 648 S.W.3d 721, 734 (Mo. banc 2022) (citing *State v. Marshall*, 596 S.W.3d 156, 161 (Mo.App.

---

[1] *Black's Law Dictionary*, 847 (8th ed. 2004) ("Something asserted but not proved.").

W.D. 2020).  In *Kumho*, the Supreme Court recognized that the *Daubert* factors may not be relevant where experts testify based on "technical" or "other specialized knowledge," rather than based on strictly "scientific" knowledge:

> [T]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.  The conclusion, in our view, is that we can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in *Daubert*, nor can we now do so for subsets of the cases categorized by category of expert or by kind of evidence.  Too much depends upon the particular circumstances of the particular case at issue.

526 U.S. at 150 (citation and internal quotation omitted).

"Regardless of what factors are evaluated, the main inquiry is whether the proffered expert's testimony is sufficiently reliable."  *First Union Bank v. Benham*, 423 F.3d 855, 861 (8th Cir. 2005).  The Eighth Circuit has admonished district courts "not to weigh or assess correctness of competing expert opinions."  *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014).  As long as the expert's testimony "rests upon 'good grounds, based on what is known' it should be tested by the adversary process with competing expert testimony and cross-examination, rather than excluded by the court at the outset."  *Id*. (quoting *Daubert*, 509 U.S. 590, 596; *Nebraska Plastics, Inc., v. Holland Colors Americas, Inc.*, 408 F.3d 410, 416 (8th Cir. 2005).  "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Benham*, 423 F.3d at 862.  "Doubts regarding 'whether an expert's testimony will be useful should generally be resolved in favor of admissibility.'"  *Clark v. Hendrick*, 150 F.3d 912, 915 (8th Cir. 1998) (quoting *Larabee v. MM & L Int'l Corp.*, 896 F.2d 1112, 1116 n. 6 (8th Cir. 1990).

The district court fulfills its role as gatekeeper by screening the proposed evidence and evaluating it in light of the specific circumstances of the case to ensure that it is reliable and sufficiently relevant to assist the jury in resolving the factual disputes. *Miller v. Baker Implement Co.*, 439 F.3d 407, 412 (8th Cir. 2006). "In sum, the district court's gatekeeping role separates expert opinion evidence based on 'good grounds' from subjective speculation that masquerades as scientific knowledge." *Glastetter v. Novartis Pharms. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001) (citation omitted).

### B. Defendant's Arguments

Defendant argues that the testimony of Plaintiff's expert Jake LaRue should be excluded under *Daubert* because his opinion regarding the mobility of pivots is so unreliable that it must not be presented to the jury. Defendant further argues that Mr. LaRue's opinion regarding pivot cost recuperation should be excluded.

Plaintiff first argues that Defendant's Motion to Exclude is untimely with respect to Plaintiff's Motion for Summary Judgment and premature as to trial. He next argues that Mr. LaRue's testimony has met all the requirements of Rule 702. Plaintiff contends that Defendant's issues with the weight and credibility of Mr. LaRue's opinions can be addressed on cross-examination at trial.

Regarding the timing of Defendant's Motion, the Court's Case Management Order provided that any *Daubert* motions be filed no later than September 15, 2022. (Doc. 83 at p. 2.) Defendant's Motion filed on August 2, 2023, was therefore timely. As a practical matter, however, the Motion was filed almost *six months* after Plaintiff filed his Motion for Partial Summary Judgment. (Doc. 50.) As Plaintiff points out, Defendant did not raise the issue of the admissibility of Mr. LaRue's opinions in his Response in opposition to Plaintiff's Motion

for Partial Summary Judgment.  As a result, the Court did not consider this issue in ruling on Plaintiff's Motion for Summary Judgment.  Because the Court ultimately denied Plaintiff's Motion for Partial Summary Judgment even considering Mr. LaRue's opinions, the issue of whether Mr. LaRue's opinions should have been considered in connection with Plaintiff's Motion for Partial Summary Judgment is rendered moot.  Plaintiff's additional argument that Defendant's Motion is an "improper premature motion in limine" lacks support and is meritless.  Thus, the Motion is properly before the Court.

      Mr. LaRue, a Professional Engineer, has been an independent Irrigation Consultant since January 2020.  (Doc. 88-1 at"goo 1.)  He has worked in the agriculture irrigation field for 49 years, beginning as a technician for irrigation management research in 1973 while attending North Dakota State University.  *Id.*  He earned a B.S. degree in Agricultural Engineering in 1977.  *Id.*  From 1976 to 1989, he worked for various agricultural irrigation companies.  *Id.*  Mr. LaRue was employed as an Irrigation Application Engineer/Operations Manager for Ellis Industries, a division of Valmont Industries, from March 1989 to February 1995 in the San Antonio, Texas office.  *Id.*  He worked for Valmont Industries, Inc., in Valley, Nebraska, from March 1995, until his retirement in December 2019.  *Id.*  Valmont makes Valley brand irrigation pivots, and "is an industry leader."  *Id.*

      Defendant does not argue that Mr. LaRue is not qualified as an expert.  Based on Mr. LaRue's qualifications and experience set out above, the Court finds that he is generally qualified as an expert on the issue of irrigation pivots.  Both of Defendant's arguments relate to the alleged lack of factual support for Mr. LaRue's opinions.  The undersigned will discuss these claims in turn.

1. **Mobility of Pivots**

First, Defendant challenges the following statement in Mr. LaRue's report: "[t]he pivots on the Hanor Farm are not practically movable back and forth between fields. It would appear that most of the pivots have been fully depreciated and it would not be financially feasible to move them to another location." (Doc. 88-1 at p. 2.) Defendant argues that this opinion is "completely refuted by the fact that the pivots have been moved." (Doc. 89 at p. 4.) Defendant cites Mr. LaRue's deposition testimony, where he acknowledges that there is a market for used pivots and that pivots can be moved without damaging the underlying property. *Id.* Defendant further argues that LaRue has only worked on a couple of projects in Southeast Missouri agriculture during his career, the most recent being over a decade ago, and is unfamiliar with how common it is to move pivots in this area.

In his report, Mr. LaRue begins by providing a historical background regarding center pivot irrigation systems. (Doc. 88-1 at 1.) For example, he notes that they were originally fixed to a specific field, but towable center pivots became more common in the 1970s. *Id.* Mr. LaRue states that moving a center irrigation system is only practical when the center pivot irrigation system can be towed back and forth in adjacent fields in a straight line. *Id.* He notes that only three percent of the Valley center pivot irrigation systems sold in the United States today are towable. *Id.* Mr. LaRue then discusses the irrigation pivots that he personally inspected on the various fields of the Hanor Farm. *Id.* at 3-9. Pictures of the pivots are included in his report. *Id.* Mr. LaRue ranks the pivots based on their general specifications and present condition; and provides his conclusions. *Id.*

7

The undersigned cannot find that Mr. LaRue's opinions are so unsupported that they should be excluded.  As previously noted, Mr. LaRue is an expert on the issue of irrigation pivots, having spent almost fifty years in the industry.  His opinions are based on his personal examination of the Hanor Farm pivots and his detailed analysis of each pivot.  Contrary to Defendant's argument, Mr. LaRue's deposition testimony does not refute the opinions provided in his report.  The fact that Mr. LaRue acknowledged that pivots *can* be moved and that there is a market for used pivots does not contradict his opinion that pivots at issue *in this case* are not *practically movable* back and forth between fields.  Mr. Larue opined that the various size and shapes of the pivot units make towing them impractical, the poor condition of towing wheels provide an indication the pivots have not "been moved in decades," the pivots were "permanently installed to large concrete pads," several of them "are very old and are near end of service," the pivots "are not practically movable back and forth between fields," and as "most of the pivots have been fully depreciated [ ] it would not be financially feasible to move them to another location."  (Doc. 88-1 at p. 2.)

Rule 702 only requires that an expert possess "knowledge, skill, experience, training or education" sufficient to "assist" the trier of fact, which is "satisfied where expert testimony advances the trier of fact's understanding to any degree." *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006).  This Court is satisfied that Mr. LaRue is qualified to opine on the condition and mobility of the pivots at issue.  This testimony will assist the jury in determining whether a pivot is a fixture.  Mr. LaRue's opinions are not without foundation, and Defendant's concerns are matters for cross-examination, not exclusion.

### 2. Cost Recuperation

Regarding Mr. LaRue's opinions as to the recuperation of the pivots' costs, Plaintiff responds that Mr. LaRue "clearly relies on his knowledge of the age of the pivots, their general valuable life, and agricultural economics to state that the pivots, in essence, paid for themselves due to the increased crop yields over the years they have been in continuous use on the Hanor Farm." (Doc. 98 at 12.)  Plaintiff states that this opinion "does not require documentary evidence." *Id.*

Unsurprisingly, there is a battle between the experts related to the cost recuperation and value of the irrigation pivots.  Plaintiff's expert opines that the pivots and accompanying equipment have value only to the farmer who owns the land while Defendant's expert, Jerry Whittington, articulates considerable value for the pivots and related items.  That said, as to one of the wells that Mr. Whittington valued at $5,000, he ultimately agreed "[y]ou're not going to get any value out of it" in that "the value of a well is only going to be of value to someone that owns the farm." (Doc. 100-1 at 18.)

Defendant argues that Mr. LaRue's general knowledge is insufficient on specific issues like the recovery of pivots' costs and their current value.  Specifically, Mr. LaRue concludes in his report that "[t]he cost of the pivot units was recovered before Charles Hanor acquired the land when their mother Irene Hanor passed in 2014," and the "pivot irrigations systems on the Hanor Farm were paid for many years ago by the greatly increased crop yields and ability to do potatoes and watermelons." (Doc. 88-1 at p. 8-9.)  Defendant argues that Mr. LaRue provides no specific information to support this conclusion, nor does he indicate what the value of the pivots is currently.  Although Mr. LaRue did not place a monetary value on the pivots, he has a wealth of knowledge regarding the cost and life of irrigation equipment due to his 49 years of experience in agriculture irrigation.  Mr. LaRue opined that the *cost of the pivots had been recovered* over time due to the successful use of

9

the pivots on the Hanor Farm.  He explained that his opinion was based on "general case [information] and knowing the age of the pivots, the probability that it would be true."  (Doc. 88-2 at 8.)

Similarly, Mr. Whittington explained that while he valued a turbine pump at $5,000 although they're removable "by the time you spend $1,500 to pull it and $1,500 to set it, you're going to have another $3,000 in it…you get up into th[at] kind of money…somebody is going to buy a new one instead of put that in an older turbine pump even though the turbine is still good." (Doc. 100-1 at 18.)

The "value" of various items is a different issue than the "cost recuperation" question.  Plaintiff submitted a receipt (Doc. 98-2) for the recent replacement of the Maple Slough East pivot.  Mr. Whittington valued the 43-year-old pivot, alone, at around $8,000.  (Doc. 100-1 at 21.)  Although the exterior of the pivot appeared to be in reasonable condition when he inspected it, *id*. at 20, the pivot failed.  The cost of replacing the pivot a couple months before Whittington's deposition was nearly $100,000.  *Id*.  Attached to the receipt was a cost "Breakdown" for the new pivot.  (Doc. 98-2 at 4.)  The cost to "tear down" the old pivot was $7,306.25 and the "scrap price" for the pivot was $5,010.50.  *Id*.  The "Breakdown" reflects that the cost to tear the old pivot down was more than its scrap value.  This gives credence to Mr. Larue's opinion that the cost of the pivots that are in use has been recovered.

Based on Mr. LaRue's assessment of the condition of the pivots and his conclusion that it would be impractical to move them, he concluded that "[i]t would make no sense to sell the pivot systems on the Hanor Farm.  Anyone purchasing the Hanor Farm would require including the irrigation pivots."  (Doc. 88-1 at 3.)

As much as Defendant argues that Mr. LaRue's opinion is not based on sufficient data or facts, *Daubert* standards do not require such an absolute requirement.  An expert's opinion may be based upon experience, and LaRue's experience-based opinion is sufficiently reliable

10

due to his detailed observations of the equipment on the Hanor Farm, his knowledge of the irrigation practices that were implemented on the farm and growing practices; and his 49 years of experience in the agriculture irrigation industry opinions.

Based on the foregoing, this Court is satisfied that Mr. LaRue is qualified to offer his opinion regarding "cost recuperation." This testimony will assist the jury in determining what, if any, value should be attributed to the pivots and related items. Once again, Mr. LaRue's opinions are not without foundation, and Defendant's concerns are matters for cross-examination, not exclusion.

The motion to exclude Mr. LaRue's testimony is denied.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion to Exclude Jake LaRue from Testifying (Doc. 88) is **denied**.

/s/ *Abbie Crites-Leoni*
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 15th day of November, 2023.